UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:08-CV-401-H

KRISTINA M. FREDERICK                                                    PLAINTIFF

V.

OLDHAM COUNTY FISCAL COURT, et al.                         DEFENDANTS

V.

LANCE VINCENT                              THIRD PARTY PLAINTIFF /
                                                          DEFENDANT

V.

BOBBY THACKER, et al.                          THIRD PARTY DEFENDANTS


**MEMORANDUM OPINION**

Plaintiff, Kristina Frederick[1] ("Frederick"), brings this action alleging gender

discrimination under the Kentucky Civil Rights Act and Title VII of the Civil Rights Act of

1964, sexual harassment and retaliation. She has named numerous Defendants, including: the

Oldham County Ambulance Taxing District d/b/a/ Oldham County Emergency Medical Services

("OCEMS"); the Oldham County Fiscal Court ("the Fiscal Court"); Duane Murner ("Murner"),

the Oldham County Judge Executive; David Thompson ("Thompson"), President of the OCEMS

Board of Directors; Mike Heilman ("Heilman"), in his capacity as former acting director of the

OCEMS; and Lance Vincent ("Vincent"), in his capacity as former director of the OCEMS.

---

[1] Plaintiff's Complaint spelled her name "Fredrick." At the August 13 conference, the parties confirmed
that the correct spelling is "Frederick." The Court noted this change in its August 16, 2010 Order.

Vincent filed a third party action against Bobby A. Thacker ("Thacker") and Christy Skaggs[2] ("Skaggs") (collectively "Third Party Defendants") alleging outrage, invasion of privacy and violations of the Federal Stored Communications Act, 18 U.S.C. §2701.[3]  The matter is now before the Court on two motions for summary judgment – one by OCEMS, Thompson and Heilman and the other on behalf of Murner and the Fiscal Court. Vincent moved to join in both motions.  Also pending before the Court is the Third Party Defendants' motion for severance.

This case presents some difficult questions arising from a bizarre and pervasive sexual atmosphere in the OCEMS workplace. On August 13, the Court met with the parties in chambers to discuss various aspects of their claims and proof. For the reasons that follow, the Court will sustain in part and deny in part the summary judgment motion of OCEMS, Heilman, Thompson and Vincent, and dismiss the claims against Thompson and Vincent.  Further, the Court will sustain the summary judgment motion on behalf of Duane Murner and the Fiscal Court, and sustain the Third Party Defendants' severance motion.

## I.

The parties to this case have engaged in extensive discovery, including taking more than twenty depositions and exchanging more than 2,500 pages of documents.  In support of their summary judgment memoranda, only a portion of that discovery was provided.  Though the parties dispute, in many instances, whether the facts are truly in dispute, it is clear that the evidence permits conflicting inferences as to many of the material facts. Because this is a motion for summary judgment, the Court views the disputed facts in the light most favorable to the

---

[2] Formerly Christy Link.

[3] Vincent's Amended Third Party Complaint alleged additional claims against Thacker and Skaggs, but the Court dismissed the other claims in an Memorandum Opinion and Order issued  on June 23, 2010.

plaintiff. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A.

Before delving into the specific details of Plaintiff Kristina Frederick's employment, her sexual relationship with OCEMS Director Lance Vincent, his subsequent resignation and her firing, the Court will recount some of the evidence about the culture at the Oldham County EMS during the relevant time period.

Sexual conduct was discussed openly. Several employees carried on sexual relationships with each other, including supervisors with their subordinates.[4] Vincent, for example, admits having sex with two subordinates – Frederick and Assistant Director Terry Stock – at different times. He told them and others about a previous relationship he had with a subordinate at a different job. Vincent kept pornography on his work computer, and showed sexually explicit material to other employees, including nude or partially nude pictures of his wife, who he involved in some of his affairs. (Vincent Dep., Vol. I, 63:4-16; 64:20-23, May 22, 2009.) He touched female employees in sexual ways while they were on duty, including by pulling them into his lap and swatting them on their bottoms. (*Id.* at 63:22-64:11.) He made comments about their breasts and asked them about their sexual preferences and experiences. (*Id.*) He discussed his outside-of-work sexual activities with subordinates and employees, including his involvement in a swinger's club where couples went to have sex with other couples. (*Id.* 63:22-

---

[4] Mike Heilman, who was named Acting Director after Vincent resigned, admitted in his deposition that he had previously engaged in a three year affair with subordinate Marsha Adams and that he had also had sexual relations with Terry Stock and other employees. The parties do not appear to dispute that Frederick had a sexual relationship with a fellow employee before her relationship with Vincent.

64:11; 119:7-18.)  He used his work computer to visit the web sites of private sex clubs.[5]

(Vincent Dep., Vol. I, 119:19-21, May 22, 2009.)

The sexually tinged environment extended beyond Vincent's behavior. One employee, Paul Skaggs, allegedly kissed female employees while they were sleeping at work. (Pl.'s Dep., Vol. I, 206:1-208:6, Oct. 19, 2009.)  As discussed in more detail below, Stock pierced the body parts of employees and others on OCEMS property. (Stock Dep. 30:20-31-4.) Various employees testified about sexually graphic conversations that occurred on work property, during work hours. This backdrop offers context relevant to the facts that led to Frederick's lawsuit.

## B.

In August 2006, Vincent, then the OCEMS Director, hired Frederick as a part-time paramedic.  By that time, Frederick had 17 years experience in her field, and had previously worked as a paramedic for the Louisville Metro Emergency Medical Service.[6]  Frederick says that soon after her employment began, Vincent asked her to have sex with him. (Pl.'s Dep. Vol. I, 10:2-23, Oct. 19, 2009.) He also asked her about her sexual experiences and sexual orientation. He continued to proposition her during her employment, and at one point told her that he could make her probation go away. (*Id.* at 12:9-10.)  Frederick repeatedly turned him down, citing various reasons for her refusal, not the least of which being that he was her boss and that they

---

[5] There is some evidence that Board Chairman David Thompson was aware of Vincent's involvement with private sex clubs, because Vincent and Thompson accidentally ran into each other on a web site for such a club and Vincent called Thompson to discuss it. (Vincent Dep., Vol. I, 119:22-121:16.) Vincent told others that Thompson was aware of his lifestyle. (Stock Dep., Vol. I, 158:17-23, June 17, 2009.) There is some evidence that Thompson was aware, at the time he made Defendant Mike Heilman Acting Director, that Heilman was having or did have an affair with a subordinate. (Stock Dep. 248:9-25.)

[6] Both Frederick and Stock allege that Vincent hired Frederick because he wanted to have sex with her. (Pl.'s Dep., Vol. I, 15:2-16:12.) Frederick was told by another employee that Vincent's wife threatened to divorce him if he hired her, and Vincent later confirmed that story to Frederick. (*Id.*)

were both married. Later, Vincent e-mailed Frederick sexually explicit pictures of his wife, including one of her nude and wrapped in chains. (Pl.'s Dep., Vol. II, 70:23-71-5, Oct. 20, 2009.) Though Frederick did not complain about the sexually explicit pictures, she did describe in her deposition various times when she complained to Vincent about his or other male employees' behavior. For example, she protested numerous times when Vincent swatted her on the bottom.[7] She also reported, at the request of another employee, that a male co-worker was kissing women while they were sleeping.  (Pl.'s Dep., Vol. I, 206:1-208:6, Oct. 19, 2009.) She contends that Vincent refused to address either complaint.

Nonetheless, at some point during her employment, Frederick began exchanging sexual texts with Vincent and having long phone conversations with him. In November 2007, she drove to his house for the purpose of having sex with him. (Pl.'s Dep., Vol. I, 6:16-9:4, Oct. 19, 2009.) The parties appear to dispute whether the sex was voluntary, but they agree that Frederick and Vincent told each other that they loved each other. They talked on the phone and sent each other text messages several times a day. Vincent's wife participated in the second sexual encounter between Frederick and Vincent.[8]  In December 2007, less than two months after Frederick and

---

[7] Frederick said that the first time Vincent swatted her bottom, she "made him very aware" that she disapproved, saying "I cannot handle anybody touching me without me asking them to, number one. But particularly slapping me on my ass sets me off. Do not touch me in that manner ever again." She said Vincent continued to do it "because he knew that it annoyed me and he thought it was comical." Frederick admits she did not complain about the behavior to anyone beyond Vincent, because "[h]e was the director, who you gonna complain to?" (Frederick Dep., Vol I, 202:17-203:12, Oct. 19, 2009.)

[8] In her deposition, Frederick said she went to Vincent's house one night when the other employees were giving her a hard time over rumors that she and Lance were together. She was upset about it. She said: "On several occasions he talked about the idea of having sex with his wife. I wasn't really interested in having sex with his wife, but on that night I went over there and we were talking about, you know, the employees and the things that – they could do. And Lance offered the option that if I were to be willing to have sex with him and his wife, that he could probably make all my problems go away and protect me at the service." (Pl.'s Dep., Vol. III, 16:9-16, Nov. 10, 2009.)

Vincent's first sexual encounter, Frederick was promoted to a full-time position with OCEMS. The parties dispute the nature of the relationship after that point. Frederick alleges that she made numerous attempts to end it and that, in response, Vincent put increasing pressure on her to continue. She recounts a situation at a New Years' Eve party in 2007 where she says Vincent got aggressive with her when she refused to have sex. (Pl.'s Dep. Vol. I, 208:10-209:9, Oct. 9, 2009.) Frederick alleged that Vincent choked her and essentially forced her to have sex with him, but that she did not report the incident as a sexual assault. (*Id.* at 208:10-209:9.) In explaining why she did not report it, Frederick said:

> Lance had spent a whole year and a half telling me how much he controlled everything in that county, all of the employees, empowered them with the ability to make sure who worked and who didn't work. [One female employee] was just passed over for a promotion. And he told me he created the positions for two other men, made her feel bad about herself, she didn't work hard enough, and she'd been a paramedic longer.

> My marriage at this point in time was not – you know, we had talked about getting a divorce in December, and I had just got a full-time position with retirement, and I needed my job. I needed it to be able to support myself and put my kid through college. I needed my own independence. And I wasn't going to stir this up. And quite frankly, I just wanted to kind of pretend it didn't exist.

(*Id.* at 211:1-14.) Frederick asserts that after the violence on New Years' Eve, she told Vincent that she was ending her sexual contact with him. Following Frederick's refusal to have sex, Vincent approached Stock – also Frederick's supervisor – to try to get Stock to intervene on his behalf with Frederick. Stock testified that Vincent approached her with this request more than once, and that Vincent was "infatuated and obsessed" with Frederick. (Stock Dep., Vol. II, Nov. 11, 2009.) Apparently, Frederick did continue her sexual relationship with Vincent up to and

after the events leading to his resignation.[9]

## C.

On February 4, 2008, Bobby Thacker and Christy Skaggs – the Third Party Defendants – disseminated a series of personal e-mails between Frederick and Vincent to the entire OCEMS staff and board. The parties disagree about whether Vincent made the e-mails available by leaving his account open on a publicly used computer, or whether Thacker and Skaggs accessed the e-mails without Vincent's permission. Frederick asserts that Vincent intentionally made their relationship public as a way to pressure her to continue their sexual relationship.

The e-mails detail both a sexual and romantic relationship.[10] For example, Frederick writes:

> I love the way you look at me, the way you touch me, feel me, carress [sic] me, make love to me and give me Eskimo kisses!!! I asked you one day last week to kiss me like you loved me... you responded, "I don't have to kiss you to do that!" Then you touched your forehead to mine, rubbed our noses and carresssed my cheeks, lips and face with yours. You never kissed me. and I KNEW you loved me!!!!

(E-mail p. 2, attached as Exh. 6 to OCEMS Defendant's Mot. Sum. J.) At another point, she writes: "You amaze me constantly! I am so happy and grateful that someone saw fit to send me you! What could I possibly have done to be worthy?" (*Id*. at 6.)

Vincent's e-mails are equally affectionate. He writes:

> We are drawn together like some weird force has turned on a switch and now we need to be together in every way. I love feeling this way, not just the feeling. But feeling this way

---

[9] The record is unclear about the temporal proximity between the end of their relationship and *Frederick's* firing. It appears Frederick was fired shortly after her last sexual encounter with Vincent, who was no longer at the service.

[10] Frederick disputes any characterization that her relationship with Vincent was more than just sex. However, her e-mails paint a different picture. She contends that these e-mails were "altered," but it appears the only change she has identified is the fact that the senders added her (misspelled) name to the e-mails.

towards you. ... I love you baby, more than I could ever put into words from my mouth or type on here. I hope you dreamed of me tonight, I know I will you. I love you baby. And by the time you read this I am sure we have talked several times and hopefully seen each other even for a brief second where I can touch my head to yours.

(*Id.* at 1.) The e-mail chain also contains extremely graphic sexual material that the Court will not reproduce here. The release of the e-mails, and their receipt by the OCEMS staff and board, set off a series of events that led to Vincent's resignation.

### D.

On or about February 5, 2008, Vincent contacted Board Chairman David Thompson and asked for a personal meeting to explain the e-mails. Thompson informed the other board members and County Judge Executive Duane Murner about the e-mails and then contacted Nancy Combs ("Combs"), an independent consultant and human resources expert. Duane Murner called Louisville Mayor Jerry Abramson to apprise him of the situation.[11]  At the subsequent meeting, the Board suspended Vincent without pay. Within a week or two of his suspension, the Board asked Vincent to resign because he had exhibited "conduct unbecoming of a supervisor." (Thompson Dep., 46:8, May 12, 2009.) Vincent resigned, but said that Thompson led him to believe, at the time of his resignation, that he could possibly reapply in the future. (Vincent Dep., 142:2-20, May 22, 2009.)  According to Frederick, Vincent believed that securing a release of liability from Frederick would help him get his job back.

As such, Frederick contends that Vincent pressured her to sign a release of liability, both while he was on paid leave, and after he was forced to resign.  She describes his requests for a release numerous times in her depositions. For example:

---

[11] He did this because Frederick was then and is now married to Louisville Fire Chief Gregory Frederick.

> [Vincent] thought if I gave [a release] – if I was to give something like that prior to when he was forced to resign, that ... he would be able to keep his position as director. He – when he was forced to resign, he told me that he lost his job because of me, and their fear of litigation. He told me if I relieved their fear, that they would allow him to keep his position or be reinstated. He – told me that he could protect me if I were to give this to him, to give to them. ... He – He tried to get me to speak to his attorney. He said that his attorney was willing to draw up the paperwork.
>
> ...
>
> On the day [Vincent] met with the judge [Murner] he told me that he was fired because of me; he was not allowed to work there as long as I worked there. He told me that the judge would – would give him his position back if he got a petition from the employees and a release from me. And he was specific about the release, that it had to release the judge, and fiscal court, and the Board of Directors, and Oldham County EMS from any – any future lawsuit pertaining to the emails and our sexual encounters. ... He told me the judge had contacted Mayor Abramson in Louisville and my husband's job may be in jeopardy if I didn't give this release.

(Frederick Dep., Vol. I, 102:17-105:3, Oct. 20, 2009.) She went on to say that Vincent told her that Heilman, the Acting Director, and another employee, Doug Johnson, would fire her for not signing the release.[12] She said:

> [Vincent] also told me that once he was forced to resign that I needed to give him a release of liability for protection. When I didn't, he told me that they would terminate me because they were his friends and wanted to protect him ... He told me Mike Heilman and Doug would do whatever they had to do to protect him. He told me that they were going to terminate me. ... They were going to find a reason to terminate me.

(Frederick Dep., Vol. III, 61:18-62:15, Nov. 10, 2009.) Vincent testified that Frederick initially floated the idea of a release, but that the two of them had several conversations about a release and that he might have asked her to contact his attorney about it. (Vincent Dep., 49:11-50:13; 169:15-171:24.)

The parties agree that no release was ever drafted. In his deposition, Thompson denied that Vincent ever offered him a release of liability in exchange for his job. (Thompson Dep.

---

[12] Frederick said numerous co-workers told her that she was fired or would be fired because she did not do what Vincent requested. Those employees included: Assistant Director Terry Stock, Rich and Molly Clavert, Scott McClamroch and Brian Bishop.

84:13-21, May 12, 2009). He also said he was not aware of Vincent making that offer to anyone else on the board. However, Murner, the County Judge Executive, said Vincent did discuss a release of liability with him. Murner testified that he did not ask Vincent to try to get a release, but Vincent offered that he could get one. Murner said: "I thought he would – that he might put that on the table to get his own job back, and nothing like that ever happened. He just said that in the course of our conversation." (Murner Dep., 42:42:3-22, May 28, 2009.) Board Member Thomas Clark also testified that Vincent had raised the subject of a release with him. Clark testified that he told Vincent that he did not think obtaining a release would help Vincent get his job back. (Clark Dep., 32:23-34:3, Oct. 28, 2009.)

### E.

After Vincent's resignation, Thompson named Mike Heilman Acting Director and hired Combs to revise the OCEMS sexual harassment policy. In late February or early March 2008, OCEMS held a sexual harassment training seminar. On March 5, 2008, Frederick signed a copy of the new sexual harassment policy. On March 15, 2008, Frederick was involved in a sexually explicit conversation in the OCEMS bay area that a male employee reported to Heilman.[13] In addition to Frederick, about a half dozen other male or female employees were present during, or involved in, the conversation. Heilman reported the conversation to the Board, and Combs was asked to investigate. To assist Combs in her investigation, Heilman asked several employees to write down what happened. He did not tell them who was involved in the investigation or what they should include in their letters. Combs never talked to the employees herself. The letters, when coupled with the testimony in this case, depict conflicting versions of what was said in the

---

[13] The conversation included jokes and graphic sexual statements about anal sex.

bay area and who started the conversation. The record also presents conflicting evidence about whether Frederick had her daughter come to the bay area to have her navel pierced on the day of the bay area incident, or whether her daughter decided to get the piercing after she arrived.  In any event, none of the parties dispute that Assistant Director Stock pierced the navels of two young women, one of them Frederick's daughter, in the OCEMS bay area and that a sexually explicit conversation occurred between several employees later that day.

In addition to gathering letters about these events, Heilman asked for and received letters from two other male OCEMS employees detailing sexual harassment-type complaints against Frederick. It appears both of the events occurred before the new sexual harassment policy was put in place.  In the first letter, Tom Taylor said Frederick sat on his lap on February 2, 2008, and that he was uncomfortable with that and told her so. Taylor said that he asked her to get up and she apologized and complied. He closed his letter by saying "I SAID STOP. SHE COMPILED [sic]. That was enough for me."[14]

The second letter, written by Stuart Crawford, described an event that occurred on February 21, 2008. Crawford said that in a discussion he had with Frederick regarding the theft of her supply kit, she "moved closer to me and placed her hand on my arm and her head on my shoulder in a manner that made me uncomfortable." Crawford later asked Frederick to meet with him and Stock to discuss the incident. In the meeting, Crawford "explained that her physical gestures and actions made me uncomfortable and that I felt such gestures and actions were not appropriate in the workplace." Crawford closed his letter by saying that Frederick "was advised

---

[14] Taylor testified that Heilman asked him for the letter around the time the event occurred. For some reason, it appears Taylor did not actually write and/or submit the letter until after the incident in the bay area occurred and Combs was called in to investigate.

that this was a verbal counseling and would not appear in her written record."

Heilman provided Combs with both the statements related to the bay incident and the additional letters related to Frederick's conduct. Based on that information, Combs suggested that OCEMS (1) terminate Frederick, (2) put Stock on probation and (3) reprimand a third participant, Emily Williams. Combs' report did not find that any of the men actively participated in the conversation and thus did not recommend discipline for any of them.

OCEMS took Combs' advice by disciplining Stock and Williams and firing Frederick. It appears that Thompson approved Frederick's firing but that Heilman was actually the one who let her go. Heilman's handwritten letter to Frederick, dated March 31, 2008, said that she was being dismissed for her involvement in sexual harassment and inappropriate conduct.

Frederick filed her Complaint in Oldham Circuit Court in July 2008, alleging sexual harassment, gender discrimination and retaliation. Defendants removed and proceeded with discovery, which has now closed. Pending before the Court are two motions for summary judgment – one by Defendants OCEMS, Thompson, Heilman and Vincent (collectively the "OCEMS Defendants") and one by the Oldham County Fiscal Court and County Judge Executive Duane Murner (the "Fiscal Court Defendants").[15] The Third Party Defendants have also filed a Motion to Sever. The Court will discuss each issue in turn.

## II.

Summary judgment is proper "if the pleadings, the discovery and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

---

[15] Vincent moved to join in this motion, but none of the arguments advanced by the Fiscal Court or Judge Executive appear to apply to him.

movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact which requires the denial of a summary judgment motion." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). In determining whether summary judgment is appropriate, the Court must resolve all ambiguities, and draw all reasonable inferences, against the moving party. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Morrison v. Bd. of Trs.*, 583 F.3d 394, 399-400 (6th Cir. 2009).

### III.

As a preliminary issue, the OCEMS Defendants move to dismiss Frederick's actions against OCEMS because she failed to exhaust her administrative remedies.

As noted above, Frederick filed this lawsuit in Oldham Circuit Court on July 2, 2008. She did not file her charge with the EEOC until October 22, 2008 and thus did not receive her right-to-sue letter until November, 2008. Filing an EEOC charge and receiving a right-to-sue letter is a precondition to filing a lawsuit based on Title VII claims. *See* 42 U.S.C. § 2000e-5; *Equal Employment Opportunity Commission v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086 (6th Cir. 1974). As such, the OCEMS Defendants argue that Plaintiff's Title VII claims should be barred because she failed to file a charge and get a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") prior to bringing her suit. Plaintiff responds

that Defendants waived their opportunity to raise this issue by failing to bring it up at the motion to dismiss stage. *Rivers v. Barberton Board of Ed.*, 143 F.3d 1029, 1031 (6th Cir. 1998) ("the receipt of a right-to-sue letter before filing a Title VII action is not a jurisdictional prerequisite, but rather a precondition subject to equitable tolling and waiver.")

The Sixth Circuit Court of Appeals has said that it is "unduly harsh" to dismiss a plaintiff's complaint due to the absence of a right-to-sue letter where the plaintiff received the letter before the district court's final order. *Dickerson v. Associates Home Equity*, 13 Fed. Appx. 323, 324 (6th Cir. 2001) (citing *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 310 (6th Cir. 2000)(claim made under Americans with Disabilities Act)). The Court believes that such a view applies here. Dismissals based on a failure to obtain a right to sue letter typically occur in cases where the plaintiff never attempted to get the letter. See *Brewer v. Cleveland Municipal School District*, 84 Fed. Appx. 570, 572 (6th Cir. 2003); *Landers v. CHLN, Inc.*, 2009 U.S. Dist. LEXIS 23931 *10-11 (E.D. Ky. 2009) "there is no indication that Plaintiff attempted to obtain a right to sue letter either before or subsequent to filing suit").

Here, where the Plaintiff has had a right to sue letter for nearly two years, it would be unduly harsh to dismiss her claim.

## IV.

Frederick alleges sexual harassment under both federal and state law.  A sexual harassment claim brought under the Kentucky Civil Rights Act is analyzed in the same manner as a claim brought under Title VII.  *Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 797-98 (Ky. 2000). In her Complaint, Frederick contends that she was subject to both "quid pro quo" and "hostile work environment" sexual harassment. In *Burlington Indus. v. Ellerth*, 118

S.Ct. 2257, 2264 (1998), the United States Supreme Court downplayed the difference in these two types of cases, noting that "the terms quid pro quo and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this are of limited utility." In short, quid pro quo and hostile work environment are just two ways to prove the same claim. Here, Frederick could take either route, because her evidence supports both.

## A.

In quid pro quo sexual harassment, an employer demands sexual favors from an employee in return for a job benefit. See *Ellerth*, 118 S.Ct. at 2264; 29 CFR § 1064.11(a)(1)-(2).[16] Generally, when the one making the demands is a supervisor and tangible job change results, the employer is subject to vicarious liability and there is no affirmative defense available. See *Ellerth*, 118 S.Ct. at 2264; *Idusuyi v. Tenn. Dep't of Children's Servs.*, 30 Fed. Appx. 398, 400 (6th Cir. 2002) (unpublished) ("where a supervisor effects a tangible job detriment against an employee under his or her authority, the employer would be liable"); *EEOC v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 510 (6th Cir. 2001); see also *Clark v. UPS*, 400 F.3d 341, 348 (6th Cir. 2005).

Here, Frederick alleges that Vincent, her supervisor, told her he could make her probation

---

[16] There are three kinds of sexual harassment outlined in 29 CFR § 1064.11(a), the first two of which describe quid pro quo harassment:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

go away in connection with an offer for sex. Furthermore, she was promoted to full-time

employment about a month after having sex with Vincent for the first time. She testified that

Vincent suggested he would "protect" her if she engaged in sex acts with his wife. She also said

Vincent implicitly threatened her employment when she tried to end the relationship. All of these

allegations constitute *quid pro quo* harassment. 29 CFR § 1064.11(a)(1)-(2); see *Meritor Sv.*

*Bank v. Vinson*, 477 U.S. 57, 65-68 (1986). At least one of them resulted in a tangible

employment action, such that OCEMS would be vicariously liable.

Plaintiff's own testimony and the circumstantial events are enough for a reasonable jury

to believe her *quid pro quo* sexual harassment claim against OCEMS.

## B.

A plaintiff may also establish a violation of Title VII "by proving that the discrimination

based on sex created a hostile or abusive work environment." *Clark v. UPS*, 400 F.3d 341, 347

(6th Cir. 2005) (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999)).

> To establish a prima facie case of a hostile work environment based on sex, a
> plaintiff must show that: (1) she is a member of a protected class, (2) she was
> subjected to unwelcome sexual harassment, (3) the harassment was based on her
> sex, (4) the harassment created a hostile work environment, and that (5) the
> employer is vicariously liable.

*Clark,* 400 F.3d at 347.  Frederick meets the first requirement, the parties dispute the others.

The OCEMS Defendants argue that there is not enough evidence that the behavior

Frederick complains of was "unwelcome." However, Frederick did show that, for more than a

year, she resisted Vincent's advances; she also contends that she tried to end the affair. She

testified that she complained about him swatting her bottom. Whether Vincent's advances were

"unwelcome" is a jury question that the Court will leave to the trier of fact.  *Meritor Sav. Bank v.*

*Vinson*, 477 U.S. 68 (1986)("the question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on determinations committed to the trier of fact").[17]

Frederick has also presented evidence relevant to element three, because some of the acts she challenged, such as Vincent's sexual advances and swatting of her bottom, would likely not have occurred if she were a man. As to the fourth element, Frederick must show that "she was subjected to severe or pervasive sexually harassing conduct." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000). No doubt, a jury could find that the evidence presented in this case meets the severe or pervasive requirement.

The last prong of the test – whether the employer is vicariously liable – requires more analysis. "Depending upon whether the alleged harasser is a co-worker or a supervisor of the victim, there are slightly different standards for evaluating whether the employer as a whole is vicariously liable for the hostile work environment." *Clark*, 400 F.3d at 348. "[A]n employer is vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Id.* (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 633 (6th Cir. 1999) (quotations omitted)). The *Clark* court went on to say that "so long as the harassment did not result in a negative tangible employment action for the victim," the employer has an available affirmative defense. *Id.* The court said:

> To avail itself of the affirmative defense, the employer must show by a preponderance of the evidence that (a) "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

---

[17] The result does not change even if Frederick's sex was "voluntary." *Meritor*, 477 U.S. at 68.

*Clark,* 400 F.3d at 348 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998)). Here, it is unclear whether Frederick's firing was related to her sexual harassment, so the Court considers whether OCEMS can establish the affirmative defense.

"Generally, an employer satisfies the first part of this two-part standard where it has promulgated and enforced a sexual harassment policy." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 275 (6th Cir. 2009)(citing *Thornton v. Federal Express Corp.*, 530 451, 456 (6th Cir. 2008). "[A]n effective harassment policy should at least: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for bypassing a harassing supervisor when making a complaint; and (4) provide for training regarding the policy." *Id.* (quoting *Clark*, 400 F.3d at 341-349-50 (6th Cir. 2005)).

The parties dispute whether OCEMS had a finalized sexual harassment policy in place before February 2008, when Vincent and Frederick's sexually explicit e-mails were released.[18] But even if it did, there were serious problems with it. First, Frederick alleges that she did not get a copy of the policy and Defendants have not offered any proof that she did. Second, the testimony of numerous deponents indicate that the policy was not enforced and that OCEMS never offered training on the policy. Third, the policy's reporting requirements did not address what an employee should do if their supervisor is their harasser. Here, Frederick's alleged harassment came not only from a supervisor, but from the OCEMS Director himself. When she protested Vincent's swatting her on her bottom, he allegedly ignored her. When she reported offensive behavior of other employees – such as the male employee who kissed various women

---

[18] The record shows the OCEMS did release a new sexual harassment policy and provide training related to it in March 2008, the same month Frederick was fired.

who were sleeping – Vincent refused to act on the matter. Because Frederick did not have direct access to the Board and Vincent repeatedly suggested that he controlled the Board, she really had no clear guidance on how to report offensive harassment.[19] Certainly, Frederick did not unreasonably fail to "take advantage of any preventive or corrective opportunities provided by the employer" because, according to her facts, there were no opportunities. Thus, as a matter of law, the affirmative defense is not available to OCEMS because they have not shown sufficient evidence to support it.

For all of these reasons, the Court declines to dismiss Frederick's sexual harassment claim against OCEMS.[20]

## V.

Plaintiff also alleges gender discrimination under the KCRA and Title VII.[21]  To state a prima facie case of gender discrimination using circumstantial evidence, a plaintiff must establish: (1) that she is a member of a protected class; (2) that she was subjected to an adverse employment action; (3) that she was qualified for the position held, and (4) that she was replaced by a person outside of the protected class or that she was treated differently than similarly situated employees. See *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007); *Mitchell v. Toledo*

---

[19] In his deposition, Board Chairman David Thompson said that the OCEMS staff never contacted him about anything, though they could have. He admits, however, that no written policy suggested that staff could contact him or the board, and that typically employees were encouraged to follow the chain of command. (Thompson Dep., 29:12-30:22, May 12, 2009.)

[20] OCEMS argues that it cannot be vicariously liable because the alleged harassment did not take place at work. The Court does not address this argument at length because the evidence presented clearly shows that some of the complained of behavior happened in the workplace.

[21] The Court addresses this claim, despite the fact that Frederick's responses barely touch on it, because she makes in her original Complaint. It is possible she has abandoned it in favor of her sexual harassment claim, discussed in the next section.

*Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Frederick clearly meets the first three elements. As to the fourth element, Frederick has alleged that she was treated differently than Vincent because Vincent was allowed to resign – which enabled him to keep his pension and other benefits – while she was fired.[22] Additionally, Frederick and the women involved in the sexual discussion that resulted in Frederick's termination were arguably treated differently than the men, in that three of the four women were terminated or disciplined, while the men were not. Either of these situations are sufficient to allow Frederick to meet the fourth element of the test.

If the plaintiff meets her burden of showing a prima facie case of gender discrimination, the burden shifts to the defendant to show a non-discriminatory reason for its action. *Texas Dep't Comty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The OCEMS Defendants assert that Frederick was fired for three instances of sexual harassment.

In response to a defendant's valid, non-discriminatory reason for a termination, the plaintiff must "show that the defendant's proffered reason was not its true reason, but was a pretext masking intentional discrimination." *Johnson v. Interstate Brands Corp.*, 351 Fed. Appx. 36, 41 (6th Cir. 2009). The *Johnson* court went on to say:

> Pretext may be established directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer's action, or indirectly by showing that the employer's proffered explanation is unworthy of credence. A plaintiff can demonstrate that an employer's explanation is not credible by showing that it (1) has no basis in fact, (2) did not actually motivate the discharge, or (3) was insufficient to warrant discharge.

*Id.* (internal citations omitted). Here, the Defendants proffered reason – sexual harassment –

---

[22] If the proof shows that Frederick was given the opportunity to resign before she was fired, Frederick will not be able to use this as an example of different treatment.

could be a pretext masking intentional discrimination. Given the overwhelmingly sexually charged environment that had been the norm at OCEMS for years, it seems that (1) sitting on a man's lap and then getting up when asked, and (2) touching a man's arm and putting a head on his shoulder, would be insufficient to warrant mention, much less discharge. It is also suspect that these complaints – one of which Frederick was told would not be put in her file – were written up *after* the incident in the bay and retroactively added to Frederick's record. While the Court does not doubt that the incident in the bay area may have required discipline, it is unusual that the supervisor on duty – who was involved in the conversation and also performed the navel piercing – would be reprimanded while Frederick was fired. In short, a reasonable jury could find that the Defendants' explanation was a pretext.

While Frederick's evidence that she was fired because of her *gender* may be thin, there was enough bizarre sexual behavior occurring at OCEMS that a jury could make a number of permissible inferences as to why she was fired. As such, the Court will allow Plaintiff's gender discrimination claim against OCEMS to go forward.

## VI.

The OCEMS Defendants also argue that Frederick cannot prove her retaliation charge. Kentucky law and federal law differ on the issue of whether an individual rather than an employer can be held liable for retaliation, in that Kentucky allows individual liability and Title VII does not. See 42 U.S.C. §2000e *et seq.*; KRS § 344.280; *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 793-94 (6th Cir. 2000). In other respects, retaliation under Kentucky law is analyzed in the same way it is under federal law. *Curtis v. Hanger Prosthetics & Orthodics, Inc.*, 101 Fed. Appx. 61, 64 (6th Cir. 2004) (unpublished) (citing *Mountain Clay, Inc. v.*

*Commonwealth*, 830 S.W.2d 395, 396 (Ky. App. 1992)).  Because Frederick brings her retaliation claim under both federal and state law, the Court must determine whether she has stated a claim against her employer, OCEMS, and individually against Vincent, Thompson and Heilman.

In order to survive summary judgment on a charge of retaliation, Frederick must present either direct evidence or a prima facie case of retaliation. *McDonnell Douglas*, 411 U.S. at 802-804. The elements of prima facie case of retaliation are:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).  Each of these elements, but particularly whether Frederick engaged in any protected activity, presents difficult questions.

### A.

As to the first prong, Frederick asserts that she engaged in two different protected activities: (1) she reported to management that she had become a target of harassment because of her sexual relationship with Vincent following his termination, and (2) she refused to provide a release of liability to Defendants or to quit her job following the broadcast of the sexually explicit e-mails.

Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this title ... or because he has made a charge, testified, assisted or participated in any manner in an

investigation, proceeding or hearing under this title [42 U.S.C. §§ 2000e-2000e-17]." 42 U.S.C. § 2000e-3(a). An employee engages in protected activity by either (1) opposing a practice made unlawful by the statute, or (2) participating in an investigation under the statute. See *Johnson v. University of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).

Here, Frederick asserts that she engaged in two protected activities: (1) she reported to management that she had become a target of harassment because of her sexual relationship with Vincent following his termination, and (2) she refused Vincent's pressure to provide a release of liability to Defendants or to quit her job following the broadcast of the sexually explicit e-mails. Neither of these activities involve participation in an investigation, proceeding or hearing under Title VII, so the Court must decide whether they constitute opposition to an unlawful employment practice.

1.

Frederick has offered only minimal proof that her first alleged protected activity – reporting to management that she had become the target of harassment because of her sexual relationship with Vincent – constitutes opposition to an *unlawful* practice under Title VII. Though the record is not entirely clear on this point, it appears the harassment Frederick reported was based on the fact that co-workers and possibly some supervisors were treating her poorly because of her affair with Vincent and his subsequent forced resignation. Such treatment has only a tangential relationship to sexual harassment or gender discrimination. Still, Title VII's definition of "protected activity" only requires that the complained of behavior is something the employee *believes to be* a violation of Title VII. *Johnson*, 215 F.3d at 579.

Furthermore, the EEOC has defined protected activity rather broadly, identifying

numerous forms of protected opposition, including "complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices ... and opposing unlawful acts by persons other than the employer – e.g., former employers, union, and co-workers." *Id.*, (citing EEOC Compliance Manual, (CCH) P 8006) (noting that the United States Supreme Court has directed that the EEOC's interpretation of Title VII be given "great deference"). The *Johnson* court went on to say:

> a violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful. ...  In short, the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable.

*Johnson*,  215 F.3d at 579-80. Thus, where, as here, Frederick alleges she complained to supervisors and others about "harassment," and she believed that harassment was based on her gender,[23] the Court finds that there is minimal, but sufficient, evidence to show that Frederick engaged in protected activity.

2.

Frederick's second "protected activity" – refusing to sign a release of liability – presents a more difficult question. As noted above, protected activities typically involve reporting or somehow opposing discrimination or sexual harassment or another activity prohibited under Title VII. Conceptually, Frederick's refusal to sign a release of her claims could be analogous to asserting that she believes she has a claim and intends to pursue it. However, the parties have not provided, and the Court has not found, any cases holding that such a refusal may constitute

---

[23] Frederick's memoranda was not clear on this issue, but her attorney made this argument at the Court's Aug. 13 hearing.

protected activity.[24] Nonetheless, the Court is guided by the language in *Johnson*, indicating that a broad range of activities can constitute protected activity and that "the only qualification that is placed upon an employee's invocation of protection from retaliation under Title VII's opposition clause is that the manner of his opposition must be reasonable." *Id.* Furthermore, certain evidence presented at trial – such as exactly what rights Frederick was asked to give up, how she responded and what she said when she refused to sign – may clarify whether Frederick's refusal to waive her rights was in fact "opposition." Thus, for now, the Court will consider Frederick's refusal to sign a protected activity.

### B.

To meet the second element of her prima facie case of retaliation, Frederick must show that the Defendants knew of her exercise of protected activity. *Morris,* 201 F.3d at 792. Because Frederick is suing OCEMS, Thompson, Heilman and Vincent for retaliation,[25] the Court will consider the knowledge of each. As to her complaints that she was being harassed, the record is devoid of evidence that Thompson knew of them. The parties agree that Vincent knew of Frederick's troubles – he both predicted them and offered I-told-you-so type statements after the fact. The parties dispute whether Heilman knew of the "harassment," but Frederick has presented some evidence that he did. Frederick also offered evidence that other supervisors and co-workers, such as Captain Doug Johnson and Assistant Director Stock, knew of her harassment

---

[24] A number of district courts have found that an employee does not engage in protected activity when he or she refuses to sign a release of liability for the purpose of obtaining severance benefits. *Reilly v. Capgemini Am., Inc.,* 2007 U.S. Dist. LEXIS 22362 *14 (N.D. Tex. 2007)(collecting Texas cases); *Bottge v. Suburban Propane*, 77 F.Supp. 2d 310, 313 (N.D.N.Y. 1999) The Court considers these cases factually distinguishable in that there is no suggestion of a claim when an employer provides a group of laid-off employees a standard release. Here, the release was specific to Frederick and arose out of circumstances that could have created liability for the county.

[25] The Court addresses the liability of Murner and the Fiscal Court in the next section.

complaints, which means OCEMS knew of them.

As to her allegation of protected activity, Frederick asserts that Vincent knew of her refusal to sign, but does not appear to have evidence that Heilman or Thompson knew of it. The excerpts of Heilman's depositions that she provided are mum on the issue. Thompson denied that Vincent raised the issue with him and Frederick offers no specific evidence to rebut his denial.

As such, Frederick has not proved that she can meet the second element of the test as to Defendant Thompson, because she cannot show that he knew of *either* of her protected activities. Thus, Frederick's retaliation claim against Thompson in his individual capacity fails and her case against him is dismissed, because none of her other claims allow her to name Thompson in his individual capacity.

### C.

The third element of Frederick's prima facie case of retaliation requires her to show that the Defendants took an adverse employment action against her. Here, there can be no doubt that OCEMS and Heilman took an adverse employment action against Frederick. Heilman fired her on behalf of OCEMS. However, the record shows that by the time the adverse employment action occurred, Vincent had left OCEMS. Because Vincent did not take an adverse employment action against Frederick, and thus cannot be held liable for firing, Frederick's retaliation claim against Vincent fails, and her claim against him is dismissed.[26]

### D.

---

[26] The Sixth Circuit test for retaliation allows a plaintiff, in lieu of an adverse employment action, to show that she was subjected to severe or pervasive retaliatory harassment by a supervisor. *Morris*, 201 F.3d at 792. It is not clear whether Kentucky would recognize this addition to the rule against an individual defendant. However, even assuming that it would, Frederick has not met her burden here to show that Vincent harassed her for refusing to sign a release of claims, that the harassment was severe or pervasive or that it occurred while he was still her supervisor.

The last element of the prima facie case of retaliation requires the plaintiff to show there was a causal connection between the protected activity and the adverse employment action. This means Frederick must show that she was either fired for her complaints about harassment or for her refusal to sign a release of liability. The evidence of a causal connection is weak, but there are a few facts from which a jury could infer that Frederick was fired for one of her protected activities. First, the events occurred relatively close in time. Both the harassment complaints and the refusal to sign a waiver happened after Vincent's forced resignation in February. Frederick was fired at the end of March. The record does not identify the specific dates of Frederick's complaints, but it appears there were several. Her refusal to sign a waiver also apparently was resolved over a matter of weeks. The facts ultimately proved at trial could place these activities very close in time to Frederick's firing. See *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citations omitted) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").

The record offers at least some other evidence of a causal connection between the release and Frederick's firing. For example, Frederick said in her deposition that Vincent told her at the time she was fired: "I'm really sorry baby, you know, I knew they were going to do that. I tried to protect you but they think you're helping me. You should have given them, I think he said, that paper... I assumed he was talking about the release." (Pl.'s Dep., Vol. I, 125:20-126:3, Oct. 19, 2009.) For these reasons, the Court finds that Frederick has presented sufficient evidence – even if just by a hair – to meet her prima facie case of retaliation.

**E.**

"If and when a  plaintiff has established a prima facie case, the burden of production of evidence shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Morris*, 201 F.3d at 792-93 (quoting *McDonnell Douglas*, 411 U.S. at 802 (1973)). "The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate that the proffered reason was not the true reason for the employment decision." *Id.* (internal quotations omitted). The Court has previously addressed the evidence relevant to pretext in Section C. In short, the record contains sufficient evidence to show that Combs' investigation could have been tainted by Heilman and a reasonable jury could conclude that the Defendants' reason for firing Frederick was pretextual. Ultimately, it is unclear why Frederick was fired. Her evidence points to a number of reasons – some lawful, others not – and a jury should make the final determination.

For these reasons, the Court will allow Frederick's retaliation claim to proceed against OCEMS and Heilman. Because she failed to produce sufficient evidence to show that Thompson or Vincent retaliated against her, the individual claims against them are dismissed.

**VII.**

Murner and the Fiscal Court (collectively "Fiscal Court Defendants") have moved for summary judgment on the grounds that they cannot be held legally responsible for any wrong to Frederick because they were not her "employer" for the purposes of Title VII or the Kentucky Civil Rights Act, and that Frederick cannot maintain a retaliation claim against them.

Title VII applies only to "employers." 42 U.S.C. § 2000e-2. To determine whether the Fiscal Court or Murner, in addition to OCEMS, were Frederick's employer, the Court begins

with the relevant statutes. Pursuant to Kentucky Revised Statute Section 67.083 (1)-(5):

> The fiscal court shall have the power to carry out governmental functions necessary for the operation of the county. Except as otherwise provided by statute or the Kentucky Constitution, the fiscal court of any county may enact ordinances, issue regulations, levy taxes, issue bonds, appropriate funds, and **employ personnel in performance of the following public functions**: ... (d) Provision of hospitals, ambulance service, programs for the health and welfare of the aging and juveniles, and other public health facilities and services; ... (4) The county judge/executive is hereby authorized and empowered to exercise all of the executive powers pursuant to this section. (5) A county acting under authority of this section may assume, own, possess and control assets, rights, and liabilities related to the functions and services of the county.

*Id.* (emphasis added). Frederick points to this language in arguing that under Kentucky law, the Fiscal Court has the authority to employ ambulance service personnel. However, her argument mostly ignores the more specific language of KRS § 108.080-140, which defines an ambulance taxing district, allows the fiscal court to create one, defines how such a district is funded and determines who is in control. Specifically KRS §108.140 says:

> The **board of directors** shall provide ambulance service to inhabitants of the district and shall have the authority to:
>
> (1) Purchase ambulance vehicles and all other necessary equipment **and employ trained personnel** which meet all federal and state requirements;
> (2) Establish a civil service system for employees of the district in accordance with the plan outlined for cities of the first class under KRS 90.110 to 90.230;
> (3) **Adopt rules and regulations** necessary to effectively and efficiently provide emergency ambulance service for the district;
> (4) **Employ person(s) to administer the daily operations of the emergency ambulance service;**
> (5) **Compensate employees of the district at a rate determined by the board**

*Id.* (emphasis added). While these statutes help guide the Court, they do not definitively answer whether the Fiscal Court could still be considered an employer for the purposes of Title VII. Therefore, the Court looks to other facts that show the relationship between Frederick, OCEMS and the Fiscal Court.

29

"The determination of whether a particular entity is an employer of a Title VII plaintiff involves an examination of whether the alleged employer exercises control over the manner and means of the plaintiff's work." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 612 (6th Cir. 2003); *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992). Here, the evidence shows that the Fiscal Court is separate from OCEMS in a number of ways. The two entities have separate budgets with independent revenue streams, separate leadership and separate internal policies. The Fiscal Court's involvement with OCEMS is limited to its appointment of the board, and its receipt of the budget. Though, through Murner, it communicated with Vincent and the OCEMS board about the e-mails and subsequent employment decisions, there is no evidence that Murner or the Fiscal Court influenced or were involved in the decision to fire Frederick. Thompson and Heilman made that decision alone – based on Combs' advice. Further, there is no evidence that the Fiscal Court controlled the "manner and the means" of Frederick's work – the Director of the OCEMS made those decisions. For these reasons, the Court finds that the Fiscal Court was not Frederick's employer for the purposes of Title VII.

Because the Fiscal Court and Murner were not Frederick's employer and did not take an adverse employment action against her, her retaliation claim against them fails also.

## VIII.

Third Party Defendants Thacker and Skaggs have moved under Federal Rule of Civil Procedure 42(b) to sever the portion of the trial related to Vincent's claims against them. Because the Court has dismissed Frederick's claims against Vincent, it will sustain the Third Party Defendants' motion to sever. The two actions now involve mostly independent facts and legal theories, and trying them in one case could complicate the primary issues and confuse the

jury.

The Court will issue an order consistent with this Memorandum Opinion.

cc:    Counsel of Record